**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**WALTER DAVIS,**

       **Petitioner,**

**vs.**                                      **Case No. 4:08cv334-MP/WCS**

**WALTER McNEIL, et al.,**

       **Respondent.**

_____/

**<u>REPORT AND RECOMMENDATION TO DENY § 2254 PETITION</u>**

This cause is before the court for ruling on a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Doc. 10 (amended petition). Doc. 1. Respondent filed an answer in response, along with relevant portions of the record. Doc. 19. References to Exs. A-M are to those submitted in paper form in support of the response. *See* doc. 19-1 (index to exhibits). References to Ex. N are to the exhibit filed electronically with doc. 20 (motion to expand the record, granted by doc. 22). Petitioner filed a reply and a notice of supplemental authority. Docs. 24 and 26. Respondent states that this § 2254 petition appears to have been timely filed. Doc. 19, pp. 8-10.

**Procedural History**

Petitioner challenges his conviction and sentence imposed by the Second

Judicial Circuit, Gadsden County. Doc. 10, p. 1. The amended information charged

that Petitioner:

> COUNT I: On or about November 9, 2003, did unlawfully attempt to kill a human being, George D. Baker, by hitting the victim with a ball bat, and the attempted killing was perpetrated from or with a premeditated design or intent to effect the death of George D. Baker, contrary to Sections 777.04(4)(b) and 782.04(1)(a)1, Florida Statutes.
>
> COUNT II: And On or about November 9, 2003, did unlawfully commit a battery upon Pamela Jones, knowing or should have known that the victim was pregnant by hitting the victim with a ball bat, a deadly weapon, or intentionally or knowingly causing great bodily harm, permanent disability, or permanent disfigurement, contrary to Section 784.045(1)(a) or (b), Florida Statutes.
>
> COUNT III: And On or about November 9, 2003, did unlawfully and intentionally make an assault upon Nadine Ware with a ball bat, a deadly weapon without intent to kill, contrary to Section 784.021(1)(a), Florida Statutes.

Ex. B, p. 11 (amended information). The victims Ware, Jones, and Baker, were

Petitioner's girlfriend, her daughter, and her daughter's boyfriend, respectively.

Petitioner was found guilty by a jury of attempted first degree murder with a

weapon on Baker (count one), aggravated battery of Jones (count two), and aggravated

assault of Ware (count three). Ex. B, pp. 19-21. He was sentenced to terms of thirty

years, fifteen years, and five years, to be served concurrently. *Id.*, pp. 24-30

(judgment). Petitioner raises two grounds in support of his § 2254 petition, addressed

ahead.

At trial, the prosecution presented the testimony of all the victims and various

other witnesses, and played the audiotape of the 911 emergency call made during the

attack. The testimony of Jones and Ware was that they were all getting along that evening, that Jones and Baker went to their room (with Jones's baby[1]), Ware and Petitioner went to Ware's room, and then an argument started between Petitioner and Ware. Ex. C, pp. 29-31, 118-122. Ware said the argument suddenly started in the bedroom, with Petitioner asking about her former husband. *Id.*, pp. 118-121. Ware and Jones testified that there was screaming, and Petitioner was running after Ware with a baseball bat, when Jones and Baker came out of their room and Baker tried to get the bat. *Id.*, p. 31-34, 122-127. Petitioner then swung the bat hard to the side of Baker's head; Baker went down immediately and stayed on the ground. *Id.*, pp. 34-36, 124. Baker was bleeding very badly. *Id.*, pp. 36-37. Petitioner returned to Ware, "yelling and punching and screaming at her;" he swung at Ware with the bat a few times but missed; in the process he hit Jones (who was trying to stop him) and hit the wall. *Id.*, pp. 37-38, 122-126.[2]

Jones said she took about three blows to her hand; she was lying next to Baker and trying to stop Petitioner from hitting Baker in the face; her hand was fractured. *Id.*, p. 42. Jones was pregnant at the time. Jones said that Petitioner already knew she was pregnant, and she also told him she was pregnant when she was pleading for him to stop beating Baker. *Id.*, pp. 42-43. She said she had a miscarriage, but neither party asked whether the miscarriage was caused by the assault. *Id.*, p. 43.

---

[1] Jones said her son, who was four months old, was "hollering" in the other room while all this was happening, and she yelled for her mother to get him out of the house. Ex. C, p. 44 (testimony of Jones explaining why Ware was not in the house when police arrived).

[2] See also *Id.*, pp. 45-47, 126-127 (evidence regarding damage to the wall).

Ware and Jones both testified that throughout the incident, Petitioner kept returning to continue beating Baker – still laying on the floor – with the baseball bat. *Id.*, pp. 38-41, 127-128. As he was striking Baker, Petitioner was saying "he was gonna kill that motherf-----," and at various times Petitioner would yell at Ware that she "still want[ed] that motherf-----, Willie Ware," referring to Ware's former husband. *Id.*, p. 39, 41. Ware said while he was doing all this, Petitioner "was rambling on about, 'I told you, don't run up in my face,' " referring to Baker, and he was cussing.

Baker testified that he had no memory of the beating. He said woke up in the hospital and did not know what had happened. *Id.*, p. 54. He testified that he used to work various jobs but could not do them now, that he could not control his left hand and his speech was slurred. *Id.*, pp. 55-56. Baker said his memory from before the incident was pretty good, that he thought that he and Petitioner had a good relationship and even now had nothing against Petitioner. *Id.*, pp. 53-54, 57-59. He conceded that he and Petitioner had exchanged words over the phone the night Petitioner and his girlfriend had an argument. He testified that they had "one exchange of words maybe out of a month's time," but they were not constantly arguing, that if they had been arguing, Baker would have stayed away. *Id.*, pp. 57-59.

Dr. Rumana, a neurological surgeon, testified about Baker's extensive skull fractures, and said when he first saw him, Baker was "deeply in a coma" with a "fixed pupil," that is, not reactive to light, indicating brain injury. *Id.*, pp. 105-109. He said Baker was paralyzed on the left side, with just a trace of movement on the right, and was put on a ventilator as he was unable to breathe on his own. *Id.*, p. 109. Baker also had hemorrhages in his brain, had suffered liver injury and rib fractures, and had blood

in his lung cavity. *Id.*, p. 109-112. Rumana described initial testing and treatment rendered to Baker, his continuing care, Baker's improvement over time, and remaining limitations. *Id.*, pp. 113-115.

Ware and Jones spoke to a 911 dispatcher during the attack, and the tape was played to the jury and transcribed for the record. *Id.*, pp. 39-41, pp. 125-129.[3] On the tape Jones told the dispatcher she thought her husband Baker was dead, and "[h]e's still trying to kill my husband," that Walter Davis beat him with a baseball bat. *Id.*, pp. 131-133.[4] Petitioner picked up the other phone line during this call, and identified himself as well as Baker by name, and said "me and her [Jones's] mama got in a [sic] argument and he tried to jump me, and I hit him with a baseball bat." *Id.*, p. 134. Petitioner said "I pay the bills in this house." *Id.*, p. 135. He then was off the phone and Jones described him to the dispatcher. *Id.*, pp. 135-136. Jones was pleading with him to stop while the dispatcher tried to ask questions, and the transcript reflects multiple interruptions with screaming, loud noises, and voices. *Id.*, pp. 136-139.

Jones told the dispatcher that Petitioner was still hitting Baker on the head and legs. *Id.*, p. 137. She said Petitioner was drinking. *Id.* Petitioner again got on the phone and said "[h]ello, ma'am" to the dispatcher. *Id.*, p. 139. He said "[t]hat man ran up on me in this house," and that "I hit him with a baseball bat. He ain't gonna run up

---

[3] Ware initially placed the call, and (apparently because Petitioner was trying to hit Ware with the bat) Jones called back and spoke to the dispatcher. *Id.*, pp. 39-40, 125-126, 129-130 (transcript of the tape, reflecting a call placed by Ware identifying her name, address, and the situation, then (as indicated by the court reporter), "Screaming, loud noises, and multiple unintelligible voices," followed by "Dial tone, then new call."

[4] Ware identified the first voice on the first call as hers and the voice on the second call as her daughter Jones. *Id.*, p. 143.

on me. I pay the bills in this house." *Id.* Petitioner was then off of the phone, and

Jones was pleading with him, so the dispatcher instructed her to "[t]ell Walter

[Petitioner] we need to speak to him real quick. Keep him on the phone, to try to keep

him from hitting him." *Id.*, p. 140.

Petitioner picked up the phone and repeated that the man "ran up on me in my

house," that "[m]e and my old lady had a [sic] argument" and "[h]e done ran up on me,

trying to fight." *Id.*, pp. 140-141. The dispatcher asked him to please wait and not hurt

Baker anymore, that the deputies would be there and would get Baker to leave, they

"will take him [Baker] with them." *Id.*, p. 141. Petitioner said he had hit him pretty hard

with the bat and did not know if he was dead or not because he was on the floor, that "I

hit him in the head pretty bad." *Id.* Petitioner said "me and my old lady been living

here," and when Baker came into the house "we had problems," "[b]ut he ain't gonna

come in this house, I'm paying bills, (unintelligible), and he tried to fight me tonight." *Id.*,

p. 142. The dispatcher said "I know it's your house and the deputies will help you, but

we'll get him out of there, okay? We'll get the ambulance to get Mr. Baker out of your

house, okay?" Petitioner responded "[y]es, ma'am." *Id.* Asked "[a]re you gonna be all

right?" Petitioner responded, "[y]es, ma'am." *Id.* Petitioner explained that he was living

there, he was not married to "the lady" yet but helped pay her bills. *Id.* He said Baker

had been having problems and he (Petitioner) let Baker come in the other night, that

they had an argument "not too long ago, then I let him came [sic] back in." *Id.*, p. 142-

143. Petitioner said: "[M]e and my old lady got in a [sic] argument and he tried to grab

me and I kind of went berserk on him." *Id.*, p. 143. The dispatcher said the deputies

would get Baker out of there, Petitioner said "[y]es, ma'am," and hung up the phone *Id.*

Officer Mitchell said when they arrived at the scene, Petitioner came out and identified himself, said he had used the bat, and was cooperative.  *Id.*, pp. 63-70. Sergeant Wilder said that when they arrived and Petitioner identified himself they handcuffed him and took him away from the scene for the safety of Petitioner as well as the officers.  *Id.*, pp. 80-81.  He left the scene with Petitioner and had to stop, while Petitioner was still in the patrol car, to assist with landing of the helicopter for Life Flight (due to Baker's injuries).  *Id.*, pp. 81-82.  Officer Mitchell said that he did not ask any questions, but Petitioner began speaking, saying there had been an argument at the house and that he "tried to kill the motherf-----," and repeated this over and over.  *Id.*, pp. 82-83.  Wilder said when he stopped the car to assist with Life Flight operations, Wilder read Petitioner his rights from his *Miranda* warning card.  *Id.*, pp. 83-84. Petitioner indicated his understanding, and continued making similar statements, that he intended to kill Baker.  *Id.*, pp. 84-85.  Wilder said Petitioner appeared angry, but not crazy, and was cooperative.  *Id.*, pp. 85, 87.

Lieutenant Moore testified that he was doing paperwork at the jail when Petitioner was brought in and put in the holding cell.  *Id.*, pp. 89-90.  He said Petitioner was angry "and he was yelling he had tried to kill the guy and he was hoping he'd die," and Petitioner continually said this throughout the night.  *Id.*, p. 91-92.  Petitioner asked Moore whether Baker died, when Moore said they had not heard anything Petitioner responded that he hoped Baker died and if he did not, Petitioner "would go kill him and burn his house down."  *Id.*, p. 92.  Moore said Petitioner did not seem intoxicated when he first came in but he could smell alcohol on his breath when they fingerprinted him. *Id.*, p. 94.

The defense at trial was only as to count one, the attempt to kill Baker.  The theory was that Petitioner "went berserk," thinking Baker was coming after him during the argument with Ware, so Petitioner was guilty of attempted second degree murder or attempted manslaughter, but not attempted premeditated or first degree murder.  Ex. C, pp. 20-24 (opening argument), 177-178 and 194-195 (closing arguments) (essentially conceding guilt on counts II and III).

Petitioner testified in his defense, after acknowledging (out of the jury's presence) his understanding that he had the right to testify or to remain silent, and that it was his voluntary decision to testify.  *Id.*, pp. 144-147.  Petitioner testified that when he moved in with Ware, Jones and Baker moved out, and that he and Baker "had a few incidents" about "me working and him not working, just issues like that."  *Id.*, pp. 150-151.  He said that one time, he (Petitioner) and Ware had an argument and the police took Petitioner away; when Petitioner called later, Baker answered Ware's phone, "and we had words over the phone," nothing specific, but Petitioner assumed that  they would fight.  *Id.*, pp. 151-152.  Although they had had "words," they never had physical contact before November 9, 2003.  *Id.*, p. 152.

After Petitioner came home from work on November 9th, he talked with everyone about an hour, then Petitioner went to the store with Ware's son, her son's wife, and Baker.  *Id.*, p. 154.  They returned from the store, and Petitioner and Baker sat outside together, sipping beer and talking about their lives and families.  *Id.*  Then they went inside and ate dinner.  *Id.*, p. 155.  After dinner the couples went to their respective bedrooms.  *Id.*, pp. 155-156.  Petitioner and Ware started arguing.  Petitioner asked why she kept talking about her former husband and she got upset.  *Id.*, p. 156.  He said it

was only after Ware ran out into the living room that he got the baseball bat from the

bedroom:

> So after she went in the front living room, that's when I got the bat and
> went behind her, not to hit her with the bat or anything, I just feared what
> George was gonna do to me because I was under the impression she was
> gonna go get George to jump on me for some reason, because me and
> him never did really – well, I didn't have nothing against him, but he
> always had something against me. So actually it was out of fear of what
> he was gonna do to me, is why I got the bat.

*Id.*, p. 157. He said they were both in the living room when Baker "come running out the

back," that he "come toward me in a rage, like he's coming after me with something. . . .

[W]hen he was coming at me he had a frown on his face like he want to fight or hurt me

somehow." *Id.*, p. 158. Petitioner said "[w]hen [Baker] came at me, he was like going –

trying to go around me. That's when I overreacted and swung the bat and hit him." *Id.*

Petitioner said Baker went down immediately after the first hit, and he "maybe hit

him twice after that." *Id.*, p. 159. Asked why he would hit him two more times,

Petitioner said "I done lost my mind, just like I had a blackout or something. After that

point, after I hit him the first time and he went down, I like had a blackout." *Id.*

Petitioner said he was in fear and did not know if Baker "was gonna stick a knife in me,

which he had a habit of toting a knife . . . ." *Id.* Asked what he meant by blackout,

Petitioner responded:

> Sir, I'm a alcoholic. A lot of times when I drink, I go through – sometimes I
> go through – after I get into anger, that anger stage, I go through stages of
> blackouts sometimes. Sometimes I don't remember certain things that
> might happen, at different times. . . . I remember me and Ms. Ware
> having the argument, and I remember hitting George the first time when
> he came in the room, and I remember hitting him a couple more times
> after that. And then after that, after that frame of time, I went through a
> stage of blackout.

*Id.*, p. 160.

Petitioner said that listening to the 911 tape had refreshed some of his memory, and he could remember hearing Ware and Jones screaming, but he could not remember hitting Baker many times after he went down. *Id.* He said he did not remember swinging the bat at Ware, and when shown the photograph of the wall (damaged by the bat), he said he did not know how it got like that. *Id.*, pp. 161-162. He remembered Jones jumping in between him and Baker, and said "if she got hit in that process, it wasn't intentionally hitting at her. It might have happened out of accident, of me hitting at him." *Id.*, p. 162. Petitioner said he was pretty calm when police arrived and he "realized, you know, what had happened. And when they came there, I just cooperated with them, you know, as best I could." *Id.*, p. 163.

Petitioner said he might have had two quarts of beer on the way home that evening with his coworkers. *Id.* He thought he had three beers when he got home; they got more beer, and he thought that he also bought some brandy. *Id.*, p. 164.

Petitioner remembered arriving at the jail and being placed in the holding cell. *Id.* He said he was angry when they put him in the cell, and kicked the door once. *Id.*, p. 165. He did not want to tell them his personal information, such as his name and date of birth. *Id.* He said he might have been shouting, and thought that he asked how Baker was, but he did not remember saying anything about wanting him dead. *Id.* Petitioner said that there were certain things he could remember clearly, and certain things he could not remember. *Id.*, p. 166. He said he used a bat on Baker because he feared Baker had a weapon and would hurt him, and when asked why he continued to hit Baker, Petitioner said he did not recall hitting Baker beyond "the four hits." *Id.*

On cross examination, Petitioner was asked how many times he remembered hitting Baker after he was on the ground, since he had said maybe two, then later said four. *Id.* 168. Petitioner replied, "like I say, sir, I hit the guy. I ain't deny the fact that I hit the guy. But how many times, like I say, I was going through stages of blackouts." *Id.* He said he did not remember half of the conversation he had with the 911 dispatcher. *Id.*

Asked why he would assume that the person he just had a pleasant conversation with would jump on him with a weapon, Petitioner said "[t]his guy was unpredictable. I heard different things about [sic] different people about him." *Id.*, p. 172. Asked if Baker might have had that look because he was afraid Petitioner would hit Ware with a bat, Petitioner said "I don't think the guy even seen the bat because I had the bat on the side of my leg," so he did not know if Baker saw it or not. *Id.*

Petitioner admitted he did not think Baker was a threat when he was on the floor curled up in a fetal position, and he hit Baker twice after that, but did not recall hitting him "over and over" after that. *Id.*, p. 173. Petitioner said he never had the intention to kill Baker. *Id.*

Petitioner conceded that he had previously been convicted of a crime of dishonesty or false statement, and the jury was instructed that it was only to consider this as relevant to his credibility. *Id.*, pp. 174-175.

As previously noted, Petitioner was convicted as charged on the three counts, and sentenced to concurrent terms of thirty years, fifteen years, and five years.

Appellate counsel filed an *Anders* brief,[5] and the judgment was affirmed.  Exs. E-G.  A

Fla.R.Crim.P. 3.850 motion was denied (as discussed further ahead).  Ex. H (3.850

record on appeal).  Denial of relief was affirmed and rehearing denied.  Exs. J-L.

**Section 2254 Standard of Review**

"An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the

courts of the State."  28 U.S.C. § 2254(b)(2).[6]  But habeas corpus relief may be granted

only if Petitioner has properly exhausted his federal claims in state court.  § 2254(b)(1)

and (c).  To do so the federal claim must be fairly presented to the state court, to give

the State the opportunity to pass upon and correct alleged violations of federal rights.

*See* Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004)

(citations omitted); Duncan v. Henry, 513 U.S. 364, 365-366, 115 S.Ct. 887, 888, 130

L.Ed.2d 865 (1995).  *See also* McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir.

2005) (holding that a petitioner must "do more than scatter some makeshift needles in

the haystack of the state court record") (citations omitted).

A petitioner "must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established

appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728,

1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying

---

[5] Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

[6] If no constitutional claims are raised, then §2254 is inapplicable and the
exhaustion inquiry is irrelevant.  Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct.
1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

this one complete round requirement to state collateral review process as well as direct appeal).  If a claim is not fairly presented through one complete round of state court review and review is no longer available in state court, it is procedurally defaulted and the petitioner must demonstrate cause and prejudice for the default *or* a miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).[7]

Even for claims properly exhausted in state court, this court's review is quite limited.

> The Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA] contains two provisions governing federal-court review of state-court factual findings.  Under 28 U.S.C. § 2254(d)(2), a federal court may not grant a state prisoner's application for a writ of habeas corpus based on a claim already adjudicated on the merits in state court unless that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

Wood v. Allen, 558 U.S. __, 130 S.Ct. 841, 845, 2010 WL 173369 (2010).[8]

---

[7] The miscarriage of justice exception applies only to extraordinary cases, where a constitutional violation has probably resulted in conviction of an innocent person. McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991). *See also* House v. Bell, 547 U.S. 518, 536-537, 126 S.Ct. 2064, 2076-2077, 165 L.Ed.2d 1 (2006) (explaining what must be shown to demonstrate actual innocence as a "gateway" to review of a defaulted claim).

[8] The Court in Wood found the state court's adjudication not an unreasonable determination of the facts in light of the evidence presented under § 2254(d)(2), so found it unnecessary "to decide whether that determination should be reviewed under the arguably more deferential standard set out in § 2254(e)(1)."  *See also* Rice v. Collins, 546 U.S. 333, 338-339, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006) (parties

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood, 130 S.Ct. at 849, *citing* Williams v. Taylor, 529 U.S. at 411, 120 S.Ct. at 1522 (discussing the term "unreasonable" as used in § 2254(d)(1)) *and* Rice v. Collins, 546 U.S. 333, 341-342, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006) ("[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.")

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court holdings. Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted) ("The decisions of other federal circuit courts (and our decisions for that matter) are helpful to the AEDPA inquiry only to the extent that the decisions demonstrate that the Supreme Court's pre-existing, clearly established law compelled the circuit courts (and by implication would compel a state court) to decide in a definite way the case before them."). *See also*, Carey v. Musladin, 549 U.S. 70, 74-

_____

disagreed on whether presumption of correctness of § 2254(e)(1) applied, but even assuming that only § 2254(d)(2) applied, the state court's decision was not an unreasonable determination of the facts in light of the evidence presented).

77, 127 S.Ct. 649, 653-654, 166 L.Ed.2d 482 (2006) (§ 2254 refers to holdings, rather than *dicta*, of the Supreme Court, but collecting circuit cases as they "[r]eflect[ed] the lack of guidance from this Court," on the issue).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings.  Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495, 1519-1520, 146  L.Ed.2d 389 (2000); Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing Williams).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.  *See also*, Panetti v. Quarterman, 551 U.S. 930, 953-954, 127 S.Ct. 2842, 2858-2859, 168 L.Ed.2d 662 (2007) (discussing the unreasonable application standard) (citing Williams, other citations omitted).

"Avoiding these pitfalls [described in Williams v. Taylor] does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."   Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in original).

The basic law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066,

2068, 80 L.Ed.2d 674 (1984). *See* Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850. Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. In reviewing such a claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that *no competent counsel* would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001) (emphasis added). *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler). Where trial counsel's performance was objectively reasonable, the fact that another reasonable lawyer would have pursued a different course is immaterial, whether or not trial counsel actually considered that different course of action. 218 F.3d at 1315, n. 16 (citations omitted). As it is an objective inquiry, it "matters little" if, after the conviction, counsel concedes his performance was deficient. *Id.* (citations omitted).

To demonstrate prejudice under Strickland, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

A state court's adjudication of an ineffective assistance claim does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied Strickland differently. Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852. To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . . Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams). "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams, 529 U.S. at 410, 120 S.Ct. at 1522.

**Claims and Legal Analysis**

**Ground One**

Petitioner first asserts ineffective assistance of counsel for failure to conduct a sufficient pretrial investigation into Petitioner's "known organic mental condition," which

renders him unable to control his anger.  Doc. 10, pp. 4 and 5a (pp. 4 and 6 in ECF)
(electronic case filing).  Petitioner claims he advised counsel of "several incidents of
blunt force [trauma] to his head when young," causing him to suffer "uncontrollable fits
of rage all his life."  *Id.*  Petitioner allegedly told counsel it was never diagnosed or
treated due to his family's poverty, and previously resulted in incarceration "where his
condition was ignored as well."  *Id.*  Petitioner then claims that a sufficient investigation
would have revealed a "well documented history" of having "berserker syndrome" all his
life.  *Id.*, p. 5b (p. 7 in ECF).   He claims counsel should have asserted a diminished
capacity, insanity, or temporary insanity defense based on "berserker syndrome,"
moved to have Petitioner subjected to a psychiatric examination, and moved to
suppress all incriminating statements as involuntary due to diminished capacity.  *Id.*, pp.
5b-5c (pp. 7-8 in ECF).

Petitioner filed a Fla.R.Crim.P. 3.850 motion, asserting ineffectiveness due to
counsel's failure to investigate his organic mental condition.  Ex. H, p. 9 (of the record,
p. 8a of the Rule 3.850 motion).  The facts alleged in state court are essentially the
same as alleged in the amended § 2254 petition.  *Compare* Ex. H, pp. 9-11 and doc. 10,
pp. 5(a)-5(c) (pp. 6-8 in ECF).  There as here Petitioner claimed, *inter alia*, that if
counsel had properly investigated he would have moved to have Petitioner and his
history subjected to psychiatric examination.  Ex. H, p. 10; doc. 10, p. 5b (p. 7 in ECF).
He claimed the undiscovered evidence would have supported a diminished capacity or
temporary insanity defense, probably resulting in a verdict of not guilty by reason of
insanity or of attempted second degree murder, and would have supported suppression
of incriminating statements.  Ex. H, pp. 10-11; doc. 10, pp. 5b-5c (pp. 7-8 in ECF).

The state court rejected the claim that counsel should have researched "berserker syndrome" and moved for psychiatric examination as "conclusively refuted by the record." Ex. H (Rule 3.850 record on appeal), p. 16 (of the record, which is p. 1 of the order).

> Trial counsel filed a motion for appointment of defense mental health expert on March 30, 2004, the motion was granted on the same day and the psychologist submitted a report to trial counsel. (See attached).

*Id.*, pp. 16-17.

Attached in support of the Rule 3.850 order is the motion for appointment of defense mental health expert. *Id.*, pp. 20-21. Counsel stated there that "the accused advised of a history of mental health difficulties, as well as a lack of memory about the incident at issue," and "would certainly appear to have a history of violent and abreactional [sic[9]] behavior resulting in numerous past criminal charges." *Id.*, p. 20. He asserted that Petitioner "arguably failed to apprehend the quality, nature and consequences of his actions ," and therefore sought a defense mental health expert to determine present competence to proceed as well as sanity at the time of the offense. *Id.*, pp. 20-21. The motion was granted, and a statement reflecting six of hours of time spent by Michael T. D'Errico, Ph.D, was submitted. *Id.*, pp. 22-23.

---

[9] An abreaction is "the expression and emotional discharge of unconscious material (as a repressed idea or emotion) by verbalization especially in the presence of a therapist," similar to catharsis. Dictionary.com. *Merriam-Webster's Medical Dictionary.* Merriam-Webster, Inc. http://dictionary.reference.com/browse/abreaction. The adjective is abreactive. *Id.*, http://dictionary.reference.com/browse/abreactive. It may be that counsel confused or combined this term with aberrational, the adjective for aberration, one definition of which is "unsoundness or disorder of the mind." *Id.*, http://dictionary.reference.com/browse/aberrational.

The state court also noted that Petitioner stated in his Rule 3.850 motion, signed under penalty of perjury, that he had not previously filed any motions with respect to the judgment and sentence. *Id.*, p. 17. This was not true, as Petitioner had previously "filed a motion reduce and/or modify sentence in which he requested a reduction of his sentence based on the self-improvement classes that he had taken while incarcerated and on the same bases he, in this proceeding, seeks to blame on the actions of his trial attorney." *Id.* (referencing an attachment). The previous motion and order denying it are attached at pages 30-42 of Exhibit H. The Rule 3.850 motion was therefore denied as "not only refuted by the record but [for raising] matters previously raised and decided." *Id.*, p. 17.

Petitioner filed a notice of appeal. Ex. H, pp. 58-59. No briefs were filed,[10] and the order was affirmed per curiam. Ex. I (docket) and J (order). He filed a motion for rehearing, signed under penalty of perjury. Ex. K. He argued:

> As to issue one of the motion the psychological examination of Appellant was limited to the question of whether Appellant was competent to stand trial, it was not obtained to support a competency [sic] at the time of the offense, [thus] the order below does not conclusively demonstrate Appellant is not entitled to any relief.

> Uncontrollable rage disorder defense must be supported by expert psychological testimony, [*Evans*] *v. State*, 946 So. 2d 1 at 8, (Fla. 2006). General insanity, is recognized in Florida as a reduced mental capacity defense.

---

[10] Under Florida law, on appeal from the summary denial of a Rule 3.850 motion without an evidentiary hearing, no appellate briefs are required. Fla. R.App. P. 9.141(b)(2)(C).

Ex. K, pp. 1-2. [11]

In sum, Petitioner argued in the trial court that counsel failed to conduct a sufficient pretrial investigation by subjecting him to a psychological examination. The claim was rejected as squarely refuted by the record showing that counsel did in fact obtain an evaluation. At the appellate level Petitioner argued that while counsel did investigate competency to stand trial, he did not have Petitioner evaluated for competency or sanity at the time of the offense. But this is also squarely rejected by the record, specifically counsel's motion (relied on by the trial court), seeking an evaluation of both. Ex. H, R. 20.

Now, in his reply to Respondent's argument and the record, Petitioner claims that defense counsel failed to interview his family and friends about his long standing history of untreated mental illness. Doc. 24, p. 7. Petitioner discusses quite generally the meaning of mental illness and its prevention, causes, and treatment. *Id.*, pp. 7-11. He asserts as "critical" that counsel interview family and friends to discover "childhood behavior patterns and mental history [and] without this psychiatrists could not properly say [there] was no problem within a six hour evaluation." *Id.*, p. 11. Petitioner claims that the evaluation he had did not include such interviews, and failed to address "physical causes for his mental disturbance." *Id.*, pp. 12-14.

Petitioner alleges that he was three and sitting on his mother's lap when she was killed in a car wreck caused by his father (which also injured other relatives). *Id.*, p. 14. He states that he moved in with his strict great aunt and uncle, who were bootleggers,

---

[11] Petitioner's citation to <u>Evans</u> is perplexing, since (as discussed ahead) it does not support his claim.

and he started drinking at a young age.  *Id.*, pp. 14-15.  He said he has always lived

around violent people, and was abused by his step brother.  *Id.*, p. 15.  He claims

problems in school causing him to be "kicked out" when he was fifteen years old.  *Id.*

He worked "at a night club that enhanced my anger problems."  *Id.*  He claims an anger

problem due to a "dysfunctional lifestyle and family poverty," which he dealt with using

alcohol, "the only way that was passed down to me."  *Id.*, p. 16.  He claims counsel

should have considered an intoxication defense, or investigated his "history of mental

disorder and psychiatric conditions."  *Id.*

It is not clear that Petitioner ever articulated in state court why the psychiatric

evaluation counsel obtained for him was insufficient, arguing instead that counsel failed

to obtain any evaluation at all.  This was refuted by the record, and Petitioner later

claimed that counsel only obtained an evaluation of competency for trial, a claim also

refuted by the record.  Even so, the written evaluation of April 21, 2004, is in this court's

file as Ex. N.[12]  It was apparently never filed by defense counsel in state court.  *See*

Exs. A (trial court docket) and B (record on appeal, index).  It was sent to defense

counsel with a letter dated April 21, 2004.  Ex. N (doc. 20-1, p. 7 in ECF).

Completely aside from whether Petitioner exhausted the claims he presented

here or (if exhausted) whether the state court considered them (thus entitling its

adjudication to deference), Petitioner cannot prevail on an ineffective assistance of

counsel claim on this record.  A "defense counsel is not ineffective for failing to present

the defense of diminished capacity *because diminished capacity is not a viable defense*

---

[12] The five page report is at doc. 20-1, pp. 2-6 in ECF.  The court references the
pages of the report as written.

*in Florida*." Evans v. State, 946 So. 2d 1, 11 (Fla. 2006), (collecting cases, emphasis added). In Evans, three expert witnesses testified in postconviction proceedings and agreed that Evans had some degree of brain damage or dysfunction based on evidence of a "closed head injury" when he was three, as well as a history of developmental and behavioral problems; two of the three experts thought he "suffered from an uncontrollable rage reaction or impulse disorder as a result of the brain damage." 946 So. 2d at 6-8. These two experts thought that because of this disorder, as exacerbated by alcohol, Evans lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the law; the third expert did not agree that the "brain dysfunction led him to behave in any particular way." *Id.*, p. 8. Despite this testimony and the fact that counsel had conducted *no* investigation in that case into mental health, the court found the ineffectiveness claim without merit. *Id.* The court held that evidence of an abnormal mental condition but insufficient to constitute insanity is not admissible to negate intent. *Id.* The court cited Chestnut v. State, 538 So. 2d 820 (Fla.1989). *See also*, Nelson v. State, _____ So.3d _____, 2010 WL 1707218, *7 -8  (Fla. April 29, 2010) (quoting Chestnut).

> [T]o be relevant to an insanity defense, expert testimony must concern whether the defendant (1) was incapable of distinguishing right from wrong (2) as a result of a mental infirmity, disease, or defect. Both aspects of the insanity defense must be addressed. Expert testimony that a defendant suffered from a mental infirmity, disease, or defect without concluding that as a result the defendant could not distinguish right from wrong is irrelevant. . . . Trial counsel cannot be deemed ineffective for failing to present inadmissible evidence.

Owen v. State, 986 So. 2d 534, 546 (Fla. 2008) (citations omitted).

In Owen, the offense had been committed in 1984, before the defense of voluntary intoxication was abolished (in 1999). *Id.*, at 541, 555 and n. 16. The trial court found that counsel was not ineffective for failing to present evidence of brain damage – insufficient alone for a defense of insanity – which was exacerbated by substance abuse. *Id.*, at 555. The court said that this was either an unsupported voluntary intoxication defense or an inadmissible diminished capacity defense. *Id.*, at 986 So. 2d at 555-556 (citations omitted). The court thought that even if the experts (presented in collateral proceedings) were qualified to offer an opinion on sanity, they did not offer an opinion about the defendant's ability to distinguish right from wrong at the time of the crime, so they would not have been permitted to testify. *Id.*, at 556. The testimony of lay witnesses (presented in collateral proceedings) would not have been permitted as none who testified at the evidentiary hearing had observed the defendant more recently than 1982; and "[a] nonexpert is not competent to give lay opinion testimony based on his personal observation that took place a day removed from the events giving rise to the prosecution," which is "clearly the domain of experts in the field of psychiatry." *Id.* (citations omitted).

At the time of the evaluation, Petitioner in the case at bar was informed of its purpose, that the information obtained would assist in determining competency to proceed and sanity at the time of the offense, and that clinical findings would be referred to counsel in a written report. Ex. N, p. 1. Petitioner was interviewed, collateral information about the offense was reviewed, and nursing and correctional staff were interviewed regarding Petitioner's behavior and current medical treatment. *Id.* The

Wechsler Adult Intelligence Scale was administered, and a Competency Assessment Instrument was used to determine competency for trial. *Id.*

Defendant gave his past history in the interview. He said he lived in Ft. Myers with his mother until she passed away when he was three, at which point he was raised by an aunt and uncle in Gadsden County as an only child. *Id.* He said he had many relatives in that community and had lived there his whole life. *Id.* There is no mention in the report that Petitioner had suffered any traumatic injury to his head, either then or at any other time. *Id.*

Petitioner "recalled he has one cousin who currently suffers from psychiatric problems and is receiving psychiatric treatment." Ex. N, p. 2. Petitioner said he dropped out of school at age 16 but had since obtained his GED. *Id.* He was not currently receiving any disability income. *Id.* He admitted to abusing alcohol, typically drinking two six packs of beer after work. *Id.* He had experienced delirium tremens, blackouts, shakes, and hallucinations. *Id.*

Petitioner thought he had previously been arrested at least forty times, mostly for battery or alcohol related offenses like DUI and public intoxication. *Id.* He had been imprisoned at least eight times, most recently for three years, between 1997 and 2000. *Id.* During that period he was involved in substance abuse treatment, Alcoholics Anonymous, and anger management training, and said he met with a psychological counselor weekly. *Id.* He said he did not have any outpatient treatment or psychiatric contact since his release in 2000. *Id.* Petitioner said that about ten years ago he tried to overdose on an unknown pill, resulting in having his stomach pumped and three days

of psychiatric evaluation at the PATH treatment center.  *Id.*  He said he was released

with no recommendation for further treatment.  *Id.*

> Since November 9, 2003, when Petitioner was confined for this offense,
> Staff at the Gadsden County Jail report that Mr. Davis is currently housed
> in general population and has not been a behavioral management
> problem.  Nursing staff report that Mr. Davis is currently prescribed no
> type of psychotropic medications and has not been in contact with officials
> from the Apalachee Center for Human Services.

*Id.*, p. 3.

When Petitioner was interviewed on April 21, 2004, he was appropriately dressed

and groomed, "cooperated fully with the evaluation process and seemed to interact well

with the examiner."  *Id.*  He was oriented as to person, time and place, and his recent

and remote memory capacities seemed intact.  "[H]is speech was clear, coherent, and

goal-directed."  *Id.*

His thought structure was deemed normal, "and ideas were meaningfully

associated."  *Id.*  He denied "homicidal ideation, delusional thinking, or experiencing any

mode of hallucinations," but said at least six months or a year before being incarcerated

he sometimes would hear voices calling his name.  *Id.*  He had no suicidal plans but

admitted thinking of it occasionally.  *Id.*  Eye contact, mannerisms, gestures, and facial

expression were normal.  He denied having problems with eating or sleeping, and

appeared calm.  *Id.*  His I.Q. score fell in the low normal range.  *Id.*

Petitioner understood the charges against him and possible penalties, and

seemed to understand the legal process.  *Id.*, pp. 3-4.  He was able to describe the

events leading up to the incident resulting in arrest, but said he was abusing alcohol.

*Id.*, p. 4.  Petitioner "noted  that he likely suffered from a loss of memory, particularly for

his alleged attacking and battery of the alleged victims," but "had no reason to doubt" their reports of what happened.  *Id.*  He understood the plea bargaining process.  *Id.*  It was determined that he had the capacity to assist defense counsel.  *Id.*  Petitioner understood what behavior would be appropriate in the courtroom.  Based on that, his verbal ability and "almost complete memory for the time period in question," as well as staff reports of no behavioral problems, it was concluded that Petitioner could act appropriately in court and was competent to be tried.  *Id.*

Regarding sanity at the time of the offense, Petitioner said he was in a pattern of drinking after work, that the attempted murder victim was engaged to his (Petitioner's) girlfriend's daughter, and all four were living in the same house.  *Id.*, p. 4.

> Mr. Davis reported that over the course of several months, this individual had been "getting on my nerves" due to personality factors and also due to the fact that he [victim Baker] was unemployed and not pitching in to help with the household finances.  Mr. Davis noted that at the time of the offense, he had come home from work and was abusing alcohol in the form of beer.  Mr. Davis estimates that he had consumed at least two six-packs of beer prior to his involvement in the instant offense.

> Mr. Davis recalled that he and his girlfriend became involved in an argument just prior to the offense and his girlfriend's daughter's fiancee attempted to break the argument up and placed his hands on Mr. Davis.  He noted that at this time he was intoxicated on alcohol, was angry due to his involvement in the argument, and assumed that his attack on the victims was related to a loss of control of his temper and his behavior.

> Mr. Davis' behavior at the time of the offense was likely at least partially related to alcohol intoxication and partially related to his longstanding problems with anger management.  The relationship between alcohol intoxication and a lowering of inhibitions resulting in impulse control problems is well documented.  On the other hand, Mr. Davis' behavior at the time of the offense would appear to be generally unrelated to symptoms of severe mental illness or mental retardation.

*Id.*, pp. 4-5.

In summary, Petitioner's attorney obtained this mental health evaluation prior to trial, and the evaluation showed no arguable basis for claiming incompetency at the time of the offense. While Petitioner now generally alleges some kind of head injury in the past, it does not appear that he told this to his attorney or to the psychologist. While he claims other people should have been interviewed about his history, Petitioner does not provide their affidavits or show how this might have changed the expert opinion as to his mental ability or competence.

Moreover, in this case three victims and Petitioner testified about to what happened that night. A 911 call was recorded and played for the jury. During the course of the call Petitioner got on the other telephone more than once and spoke calmly and clearly, and then resumed the attack. Petitioner's claim at that time (while the offense was still ongoing), through his arrest, and at trial was that Baker "came up on him" during his argument with Ware and Petitioner feared Baker. It was agreed by all that Baker went down after the first blow. It was clear from the testimony of Ware and Baker, as well as the 911 recording and the injuries sustained by Baker, that Petitioner hit Baker repeatedly with the bat when Baker was down. Petitioner said he did not remember after the first few times that he hit Baker with the bat. Because the jury heard the 911 tape, the jury could hear for itself the tone of Petitioner's voice while the attack was actually ongoing. For all of these reasons, ground one provides no relief.

**Ground Two**

In ground two, Petitioner asserts ineffective assistance of counsel for failing to file a motion for new trial. He asserts that a motion for a new trial should have argued that the jury failed to make a specific finding of great bodily harm as to count two, and failed

to make a specific finding that the bat constituted a deadly weapon as to count three.

Doc. 10, pp. 4 and 5d (pp. 4 and 9 in ECF).  He claims that these findings were

necessary to support the degree of offenses and severity of sentences imposed.  *Id.*, p.

5d (p. 9 in ECF).

Petitioner made these same two claims in support of his ineffective assistance of

counsel claim in state court, "contend[ing] that if counsel had filed a motion for new trial

on those issues the court would have granted the motion or, at least, the issue would

have been preserved for appeal."  Ex. H, p. 17.  The court found:

> This claim is also [*i.e.*, like the ineffectiveness claim raised as ground one]
> refuted by the record.  Furthermore, it could have and should have been
> raised on appeal.  The jury was presented with 12 forms of verdict from
> which to designate their findings as to guilt or innocence as to each count.
> The jury made a finding that a weapon was used as to each count and
> that the battery was an aggravated battery and the assault was an
> aggravated assault, as charged.

*Id.*

The state court's rationale, however, in part does not fully address the issue.

Unlike the initial ineffectiveness claim (that counsel should have investigated Petitioner's

competency and sanity), there is no showing that counsel actually filed a motion for new

trial raising these claims (as there was showing that counsel obtained a psychiatric

evaluation).  *See* Ex. A (trial court docket).  That a claim for a new trial could or should

have been raised on appeal seems to ignore the ineffectiveness claim, that counsel

failed to preserve the new trial claim for appeal.

The jury did find, as discussed ahead, that Petitioner was "guilty as charged" of

counts two and three.  As charged in count two of the amended information, Petitioner

committed a battery on Pamela Jones, when he knew "or should have known that the

victim was pregnant by hitting the victim with a ball bat, a deadly weapon, or

intentionally or knowingly causing great bodily harm, permanent disability, or permanent

disfigurement, contrary to Section 784.045(1)(a) or (b), Florida Statutes." Ex. B, p. 11.

The court instructed the jury that, to prove aggravated battery as charged in count two,

the State had to prove beyond a reasonable doubt:

> Number one, Walter Davis intentionally touched or struck Pamela Jones
> against her will or intentionally caused bodily harm to her; and two, Mr.
> Davis, in committing the battery, intentionally or knowingly caused great
> bodily harm, permanent disability, or permanent disfigurement to Pamela
> Jones, and/or knew or should have known that Pamela Jones was
> pregnant.
>
> Again, a weapon is a deadly weapon if it is used or threatened to be used
> in a way likely to produce death or great bodily harm.

Ex. C, p. 207. The jury was also instructed on the lesser included offense of simple

battery. *Id.*, pp. 207-208. The jury found Petitioner "guilty as charged of aggravated

battery of Pamela Jones" in count two. Ex. B, p. 20.

Under Florida law it would be aggravated battery – a second degree felony – if

Petitioner intentionally caused "great bodily harm, permanent disability, or permanent

disfigurement," (hereafter great bodily harm), *or* if he used a deadly weapon, *or* if the

victim was pregnant and he knew or should have known she was pregnant. FLA. STAT.

§ 784.045(1)(a) and (b). *See also* Stoute v. State, 915 So. 2d 1245, 1248 (Fla. 4th DCA

2005) ("[a]ggravated battery is an alternative intent crime."). Thus, the crime may be

committed by causing great bodily harm, by using a deadly weapon, or if the accused

knew or should have known the woman was pregnant. *See* Lareau v. State, 573 So. 2d

813, 815 (Fla.1991) (discussing the statute, noting that "the punishment for battery

increases as the degree of actual injury or potential for serious injury becomes

greater.").  Indeed, although it was not done here and count two was treated as a

second degree felony (ex. B, p. 24), aggravated battery causing great bodily harm, or a

battery upon a known to be pregnant victim, which *also* involves the use of a deadly

weapon, could have been charged as a first degree felony[13]

   While the charges and instructions might be slightly confusing,[14] there was

clearly evidence of aggravated battery regardless of whether the jury found great bodily

harm.  Jones testified that she was pregnant, Petitioner was present before when her

pregnancy was discussed, and she told him she was pregnant during the attack on

Baker.  Ex. B, pp. 42-43.  This was sufficient evidence for a finding that Petitioner knew

that Jones was pregnant, which made the offense an aggravated battery.  He also hit

her hand several times with a baseball bat as she tried to protect Baker, the same

---

[13]  *See* Lareau, 573 So. 2d at 815  (aggravated battery causing great bodily harm
may be reclassified as a first degree felony for use of a weapon under § 775.087(1));
Stoute v. State, 915 So. 2d 1245, 1248 (Fla. 4th DCA 2005) (citing Lareau, noting that
reclassification is permitted when aggravated battery is based on great bodily harm and
not on use of a deadly weapon, because then use of a weapon is not an element of the
aggravated offense); State v. Robbins, 936 So. 2d 22, 24-26 (Fla. 5th DCA 2006)
(discussing Lareau, other citations omitted); Aroche v. State, 993 So. 2d 568, 569-570
(Fla. 3d DCA 2008) (proper enhancement under § 775.087, for use of a deadly weapon,
i.e., a knife and or a bat).  In Aroche, the information charged defendant with the various
offenses (burglary, attempted first degree murder, and second degree murder), and
charged as to each that the commission of the offense involved use of a deadly weapon
under § 775.087, so the weapon was not an essential element of the offense.  *Id.*, at
569 and cases cited.  Had Petitioner been similarly charged here as to the battery of
Jones, an enhancement would have been proper.

[14]  The information seemed to charge that Petitioner either battered Jones with a
deadly weapon *and* knew she was pregnant, or battered her causing great bodily harm.
The instruction was to find aggravated battery if there was battery either involving great
bodily harm or knowing that Jones was pregnant.  The court then repeated the definition
of deadly weapon, though it did not instruct that use of a deadly weapon made the
battery an aggravated battery.

object used to render Baker close to death, and her hand was broken. A basis for granting a new trial has not been shown. Therefore, Petitioner has not shown deficient performance or prejudice, particularly in light of the potential for reclassification of the offense.

As charged in count three of the amended information, Petitioner committed an assault on Nadine Ware "with a ball bat, a deadly weapon without intent to kill, contrary to Section 784.021(1)(a), Florida Statutes." *Id.*, p. 11. The court instructed that to prove aggravated assault as charged in count three:

> [T]he State must prove the following four elements beyond a reasonable doubt: Number one, Walter Davis intentionally and unlawfully threatened, either by word or act, to do violence to Nadine Ware; two, at the time Mr. Davis appeared to have the ability to carry out the threat; three, the act of Mr. Davis created in the mind of Nadine Ware a well-founded fear that the violence was about to take place; and four, the assault was made with a deadly weapon.
>
> Again, a weapon is a deadly weapon if it is used or threatened to be used in a way likely to produce death or great bodily harm. It is not necessary for the State to prove that the defendant had an intent to kill.

Ex. C, pp. 208-209. The jury was also instructed on the lesser included offense of simple assault. *Id.*, p. 209.

The jury found Petitioner "guilty as charged of aggravated assault of Nadine Ware." *Id.*, p. 21. The jury instruction stated that use of a deadly weapon was one of the elements the jury had to find was proved beyond a reasonable doubt, and the finding of guilty as charged included this element. *See* Whitehead v. State, 446 So. 2d 194, 198 (Fla. 4th DCA 1984) (where information charged aggravated assault with a deadly weapon without intent to kill, the jury was instructed that an element of the charge was that a deadly weapon was used and was given the definition of deadly

weapon, a verdict of guilty of aggravated assault as charged was sufficient: "[w]here the information makes reference to a deadly weapon and the jury is instructed to that effect a verdict which incorporates the crime charged in the information by reference constitutes a specific finding that the crime was committed with the use of a deadly weapon."). There was no error or prejudice in counsel's failure to object on this basis. For all of these reasons, ground two affords no relief.

**Recommendation**

For the foregoing reasons, it is respectfully **RECOMMENDED** that the § 2254 petition for writ of habeas corpus, challenging the judgment and sentence imposed on Petitioner Walter Davis by the Circuit Court in Gadsden County, case number 03-844-CF-A, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on August 16, 2010.

**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.